1  Zachary M. Smith, State Bar No. 78241
   W. Scott Cameron, State Bar No. 229828
2  **WEINTRAUB TOBIN** CHEDIAK COLEMAN GRODIN
   LAW CORPORATION
3  400 Capitol Mall, 11th Floor
   Sacramento, California 95814
4  Telephone:    916.558.6000
   Facsimile:    916.446.1611
5  Email: ZSmith@weintraub.com
            SCameron@weintraub.com
6

7  Attorneys for Plaintiffs
   PMM Holdings, LLC and Precision
8  Machine & Manufacturing

9

10                  UNITED STATES DISTRICT COURT

11                  EASTERN DISTRICT OF CALIFORNIA

12

13  PMM HOLDINGS, LLC and PRECISION        Case No.  2:25-cv-02005-CSK
    MACHINE & MANUFACTURING,
14                                          **FIRST AMENDED COMPLAINT**
                    Plaintiffs,
15
          v.
16
    DHG, INC.,
17
                    Defendant.
18

19

20        Plaintiffs PMM, Holdings, LLC ("PMM Holdings") and Precision Machine &

21  Manufacturing, Inc. ("Precision"), referred to together in this Complaint as "Precision" or

22  "Plaintiffs," allege upon information and belief against defendant DHG, Inc. ("DHG" or

23  "Defendant"), and as to DHG's parent corporation, Three Cities Research, Inc. ("Three Cities"),

24  and DHG's affiliates, subsidiaries and agents, Finn Corporation ("Finn"), and Express Blower Inc.

25  ("EB"), together referred to herein as "DHG's Companies," as follows:

26  ///

27  ///

28  ///

## JURISDICTION AND VENUE

1.     The U.S. District Court for the Eastern District of California ("Court") has subject matter jurisdiction over the claims in this case because the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

2.     The Court also has subject matter jurisdiction because Plaintiffs state claims including claims under federal laws which confer federal question subject matter jurisdiction on the Court including the Defend Trade Secrets Act 18 U.S.C. § 1836.

3.     The Court has specific personal jurisdiction over Defendant because DHG has availed itself of the benefits of the State of California in doing business within the state, has targeted the property of California domiciliary, PMM Holdings, for misappropriation by the Defendant, has committed breaches of contract and wrongful, unlawful acts damaging PMM Holdings and its wholly-owned subsidiary, Precision, in California, and because the Defendant is bound by a contract by which each of the DHG Companies consented to the jurisdiction of the state and federal courts of California, all as more fully alleged herein in paragraphs 14, 15, 15.3, and 15.4.

## PARTIES AND THEIR AGENTS

4.     Plaintiff PMM Holdings is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Sacramento, California. PMM Holdings owns 100% of the shares of Precision.

5.     Plaintiff Precision is a corporation organized and existing under the laws of the State of Oregon and is the wholly-owned subsidiary of PMM Holdings.

6.     Defendant DHG is owned by Three Cities Research, Inc. DHG and its subsidiaries are primarily engaged in industrial manufacturing and distribution. DHG is registered with the Secretary of State of Ohio as a for-profit corporation organized under the laws of Ohio as entity number 763188.  DHG operates from its principal office 9281 LeSaint Drive, Fairfield, Ohio, but does business in many other states, including, but not limited to, in Oregon and California. DHG owns, controls and acts through, Finn and EB as wholly-owned subsidiaries and/or affiliated organizations.

weintraub **tobin** chediak coleman grodin
law corporation

7.    Finn is a wholly-owned subsidiary of DHG and is registered with the Secretary of State for Ohio as a for profit corporation organized under the laws of Ohio as entity number 166266.  Finn operates from its principal office at 9281 LeSaint Drive, Fairfield, Ohio but does business in other countries and states, including, but not limited to, in Oregon and California, and serves as the agent of DHG, under the ultimate direction and control of DHG.

8.    EB is a wholly-owned subsidiary of DHG and/or Finn and is registered with the Secretary of State for Ohio as a for profit corporation organized under the laws of Ohio as entity number 2380014.  EB operates from its principal office at 9281 LeSaint Drive, Fairfield, Ohio but does business in many other states, including, but not limited to, in Oregon and California, and serves as the agent of DHG and Finn, under the ultimate direction and control of DHG.

## FACTS COMMON TO ALL COUNTS

9.    Plaintiffs are in the business of designing, manufacturing and selling industrial machinery, primarily heavy duty rotary airlock feeders, rotary valve airlocks and screw conveyors as components for material handling systems. To conduct such business, PMM Holdings owns Precision which performs the design, manufacture and sales of such machinery. Precision's rotary airlock feeder is a unique product, highly regarded in the industry, and particularly effective in blower truck and blower equipment applications.

10.    DHG conducts the business of building and selling material placing trucks and equipment, commonly referred to in the industry as blower trucks, blower equipment, mulch blowers and/or bark blowers, through its wholly-owned entities Finn and Express Blower.

11.    In 2015 and 2016, at DHG's instigation, DHG's subsidiary Finn and Precision discussed a potential arrangement by which Precision would design, manufacture and supply to Finn and Finn's wholly-owned subsidiary, EB, Precision's rotary airlock feeders ("feeders") to be installed by Finn and EB as a component part in some of their equipment. Precision proposed to design, build and supply new generation feeders which would be superior to the feeders Finn and EB had been installing in their blowers and blower trucks in the past.

12.    The discussions resulted in a Memorandum of Understanding ("MOU") signed by Matt Day, the then Vice President of Operations for both of the DHG entities, Finn and EB, and by

weintraub tobin chediak coleman grodin
law corporation

Precision's former President, Kirk Morton, on or about February 9, 2016. A true and accurate copy of the signed MOU is attached to this Complaint as **Exhibit 1** and incorporated into the Complaint by this reference as though set forth in full and verbatim.[1] Pertinent to this case, the MOU provides that:

12.1    Precision was responsible for the overall design of the feeders (**Exhibit 1**, p. 1, "Design Changes") and owns such designs in order that Precision would "license its designs for rotary feeders to FINN and EB" if the parties' "business relationship" described by the MOU ever ended (**Exhibit 1**, p. 4, "Aftermarket");

12.2    The parties were bound to "protect the confidentiality of the designs, pricing, purchase volumes, and any other information about their business relationship (**Exhibit 1**, p. 4, "Non-Disclosure");

12.3    The parties agreed to initial pricing based on minimum lot size orders as set forth in the agreement (**Exhibit 1**, p. 2, "Initial Pricing" and "Minimum Lot Size Order");

12.4    DHG's companies would purchase a minimum number of feeders from Precision each calendar year (**Exhibit 1**, p. 3, "Minimum Annual Purchases");

12.5    Upon the commencement of the business relationship established by the MOU, Precision would "withdraw from supplying feeders into the blower truck aftermarket," remove references to blower truck feeders from its advertising materials, and "direct any customer inquiries that it receives to FINN and EB" (**Exhibit 1**, p. 3, "Aftermarket");

12.6    On the conditions that the parties were "satisfied with the business relationship" and "that the annual minimum order volume is being met" Precision would "stay out of the aftermarket and not compete with FINN and EB for blower truck feeder sales, parts, service or rebuilding" (**Exhibit 1**, p. 3, "Aftermarket");

///

///

---

[1] Because the MOU (**Exhibit 1**) contains information the parties agreed to keep confidential, Plaintiffs requested that the MOU be redacted prior to filing pursuant to Local Rule 141. The Court granted Plaintiffs' request.

**weintraub tobin** chediak coleman grodin
law corporation

12.7    Any feeder developed and manufactured by Precision during the course of the business relationship described in the MOU would be subject to the terms of the MOU (**Exhibit 1**, p. 1, "Products"); and

12.8    If the business relationship described in the MOU came to an end, that Precision would remain "out of the aftermarket business" for a specified period and "license its designs for rotary feeders to FINN and EB on terms to be negotiated later" **Exhibit 1**, pp. 3-4, "Aftermarket").

13.     Precision has performed its obligations under the MOU:

13.1    At its sole cost and risk, Precision customized its own proven feeder designs to serve as new and improved feeders for use as a component within Finn and EB's blower trucks and blower equipment. Precision developed, designed, manufactured, and sold to Finn its new 18x33 model to replace Finn's old "12-Series" model, Precision's new 16x25 which replaced Finn's old "5-Series" model, and Precision's new model "302" to replace Finn's old model called "BB302". Precision also developed and designed what Precision designated as a 12x15 model feeder for a new material blower machine that Finn was developing. All the feeders bear Precision serial numbers and the drawings for all of the new feeders designed and engineered by Precision, including the new 302 rotary feeder, bear the Precision legend and insignia and are under Precision's exclusive ownership, possession and control;

13.2    Precision has filled Finn's orders for the feeders designed and manufactured by Precision despite the fact that Finn has ordered the feeders in lot sizes which did not comply with the minimum lot size orders called for by the MOU;

13.3    Each of the Precision feeders supplied to Finn was painted "Finn beige" at Finn's request but bore a Precision serial number as Precision was the original manufacturer of such feeders; and

13.4    Precision withdrew from the "aftermarket business" while the "business relationship" between the DHG Companies and Plaintiffs was satisfactory to the

weintraub **tobin** chediak coleman grodin
law corporation

1    parties; and Precision has adhered to the non-disclosure and confidentiality

2    provisions of the MOU.

3        14.    In 2024, the "business relationship" began to change.  DHG and Three Cities

4    represented that DHG was interested in potentially doing business with Plaintiffs and entered into a

5    "Non-Disclosure Agreement," dated January 23, 2024, and signed by Christopher Erickson on

6    behalf of DHG and Three Cities (the "DHG NDA") A true and accurate copy of the signed DHG

7    NDA is attached to this Complaint as **Exhibit 2** and incorporated into the Complaint by this

8    reference as though set forth in full and verbatim.  On January 31, 2024, Christopher Erickson and

9    Dave Hammond, CEO and Group President of Finn, made a physical visit to PMM and again

10   expressed to Don Lindsey, President and CEO of Precision, that DHG had an interest in acquiring

11   Precision.

12       15.    As it relates to the Plaintiffs' allegations against Defendants and the DHG

13   Companies, by the terms of the DHG NDA, DHG bound itself and its affiliates to:

14       15.1    Maintain in strict confidence any and all information and/or "materials in whatever

15           form" obtained from Precision ("Confidential Information") (**Exhibit 2,** DHG NDA,

16           p. 1,  Sec. 1, "Confidential Information," p. 2, Sec. 3, Sec. 3 "Nondisclosure and

17           Limited Use" and Sec. 4 "Transaction Information," p. 3 Sec.7, "Return and

18           Destruction of Confidential Information," p. 4, Sec.10, "Requests for Information;

19           Discussions," and pp. 4-5, Sec. 11, "Non-Circumvention");

20       15.2    Refrain from transmitting to any third party any Confidential Information or

21           information of any proposed transaction. (**Exhibit 2,** DHG NDA, p. 2, Sec. 3

22           "Nondisclosure and Limited Use" and Sec. 4 "Transaction Information", p. 4,

23           Sec.10, "Requests for Information; Discussions," and pp. 4-5, Sec. 11, "Non-

24           Circumvention");

25       15.3     Submit and consent to the application of the laws of the State of California with

26           respect to the DHG NDA (**Exhibit 2,** DHG NDA, p. 6, Sec. 16 "Governing Law");

27   ///

28   ///

weintraub **tobin** chediak coleman grodin
law corporation

15.4    Submit and consent to the jurisdiction and venue of any of the state and federal courts of the State of California with respect to any suit arising out of the DHG NDA (**Exhibit 2,** DHG NDA, p. 6, Sec. 16 "Governing Law");

15.5    Reimburse the prevailing party in any litigation relating to the DHG NDA such party's "commercially reasonable, documented and out-of-pocket costs and expenses, including legal fees, incurred in connection with such litigation" (**Exhibit 2,** DHG NDA, p. 6, Sec. 19 "Attorneys' Fees");

15.6    That violation of the DHG NDA by DHG entitles Plaintiffs to seek injunctive relief without posting a bond (**Exhibit 2,** DHG NDA, p. 5, Sec. 13, "Remedies"); and

15.7    Agree that the DHG NDA "supersedes all prior and/or contemporaneous agreements and understandings, written or oral, between the Parties or their respective agents concerning the subject matter hereof" (**Exhibit 2,** DHG NDA, p. 5, Sec. 14, "Term of Agreement") and/or with respect to the "Confidential Information" (**Exhibit 2,** DHG NDA, pp. 6-7, Sec. 21, "Integration, Modification").

16.    Thereafter, in May of 2024, William Meyer and Sons, Inc. ("Meyer") entered into a "Confidentiality Agreement" with PMM Holdings, by and through PMM Holdings' financial advisor and representative, Crown Point Partners, LLC, in connection with Meyer's purported interest in a potential transaction with Plaintiffs. A true and accurate copy of the signed "Confidentiality Agreement," dated May 7, 2024, signed by Charles Meyer as CEO of Meyer (the "Meyer NDA") is attached to this Complaint as **Exhibit 3** and incorporated into the Complaint by this reference as though set forth in full and verbatim.

17.    The Meyer NDA included provisions by which Meyer agreed:

17.1    To "hold in confidence and trust" any and all "Confidential Information," defined as including, "without limitation, information regarding … the Company's … services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, compositions, inventions, discoveries, designs, sketches, drawings, [etc.] and Plaintiffs' financial data including "existing and potential

///

weintraub tobin chediak coleman grodin
law corporation

customers, employees, vendors or suppliers" (**Exhibit 3,** Meyer NDA, p. 1, Sec. 2, "Confidential Information" and Sec. 3, "Disclosure and Use Restrictions");

17.2   To not "disclose or otherwise provide or transfer, directly or indirectly, any Confidential Information to any third party without prior written consent of the Plaintiffs" (**Exhibit 3,** Meyer NDA, p. 1, Sec. 3, "Disclosure and Use Restrictions");

17.3   That violation of the Meyer NDA by Meyer entitles Plaintiffs to seek injunctive relief without posting a bond (**Exhibit 3,** Meyer NDA, p. 2, Sec. 10, "Irreparable Harm").

18.   As with the MOU (**Exhibit 1**), Plaintiffs have operated in good faith and have complied with the provisions of the DHG NDA (**Exhibit 2**) and the Meyer NDA (**Exhibit** 3).

19.   DHG, on its own and by and through its DHG Companies, has breached the MOU (**Exhibit 1**) through the following conduct:

19.1   After the first year, Finn and EB failed to adhere to the minimum lot sizes commitment contained in the MOU (**Exhibit 1**); and

19.2   Once the "business relationship" established by the MOU ended due to failure of the conditions precedent concerning minimum lots sizes and minimum annual purchases, DHG and the DHG Companies failed to license the Plaintiffs' feeders and, instead, undertook a scheme to use the designs and other proprietary information related to the feeders to evade licensing Precision's feeders from Precision or otherwise compensating Precision for the use of its designs and other proprietary information concerning Precision's airlock rotary feeders.

20.   DHG, on its own and by and through DHG's Companies as DHG's agents, have violated the DHG NDA (**Exhibit 2**) and have misappropriated Precision's design, manufacturing processes, intellectual property, trade secrets, proprietary information and/or other Confidential Information associated with Precision's feeders, through the following conduct.

20.1   Both DHG and Meyer falsely represented to Plaintiffs that they were interested in doing business with Plaintiffs in order to gain access to all of Plaintiffs' proprietary and trade secret information and other Confidential Information though the

FIRST AMENDED COMPLAINT

disclosures of information contemplated by the DHG NDA and the Meyer NDA rather than for the true purpose of  evaluation, negotiation, documentation or consummation of a transaction with Precision and/or PMM Holdings (**Exhibit 2**, DHG NDA, p.1, first para., p. 2,  "Non-Disclosure and Limited Use"  and **Exhibit 3**, Meyer NDA, p. 1, "Purpose");

20.2    Through the access granted by the DHG NDA, DHG, and DHG's Companies acquired commercially exploitable and proprietary information that constituted Precision's Trade Secrets, including:

20.2.1    <u>Key Customers</u>:  DHG gained access to Precision's key customers by name, annual revenues, and the industries in which they operate.

20.2.2    <u>Suppliers</u>:  Precision had recently introduced ion-nitride as a surface treatment option in place of industrial hard chrome on blower truck feeders. Precision pioneered this technology on rotary feeders and DHG learned who Precision's supplier is for this service.  DHG also learned where Precision purchased its steel, including its specialty U.S.-sourced abrasion-resistant alloy.  This information was not generally known in the industry.

20.2.3    <u>Costs and Margins</u>:  DHG gained access to Precision's margins and costing, which was an area discussed almost every time DHG and Precision communicated.

20.2.4    <u>Competitors</u>:  DHG gained insight into who Precision's competitors were, the industries in which they operated, and provided DHG with a competitive list to whom they could take Precision's product in order to have the product reverse engineered.

20.2.5    <u>Design/Engineering</u>:  For almost a decade, Precision has been designing and engineering feeders that were built for DHG.  Precision owned the intellectual property of these designs, drawings, and technical information. Precision designed a 12X15 feeder for DHG, and when DHG wanted

///

**weintraub tobin** chediak coleman grodin
law corporation

changes to this design, Precision sent them a basic set of drawings that DHG is now claiming is DHG's intellectual property.

20.2.6 <u>Proprietary Information</u>:  During the Precision plant tours that Dave Hammond and Christopher Erickson went on, they gained access to the work cells that are in place specifically for Finn's products. Just two years earlier, Precision had purchased a robot cell, which was purchased primarily to process Finn's feeders so Precision could achieve the lower price/cost that DHG demanded. Precision also showed them the importance of the horizontal boring mills and the machining centers, which were critical functions in the cost-effective manufacturing of their components.

20.2.7 <u>Outsourcing</u>:  DHG learned about the functions Precision outsourced due to Precision not having in-house capabilities, including to whom Precision outsourced these functions and the costs associated.

20.2.8 <u>Financials</u>:  DHG gained access to multi-year financial records, budget projections, industry focus, areas of growth, specific tasks that were employed to increase profitability and Precision's focus and strategy going forward.

20.2.9 <u>Growth</u>:  DHG obtained annual growth of revenue by product year-over-year, which included blower truck feeders.  This is powerful information that could be used to show a competitor when DHG is shopping Precision's feeder around to be reverse engineered.

20.3    DHG and DHG's Companies violated the NDAs by sharing the Confidential Information gleaned from their dealings with Plaintiffs;

20.4    DHG and DHG's Companies learned that Meyer was a competitor of Plaintiffs through the process surrounding the potential transactions which were the subjects of both the DHG NDA (**Exhibit 2**) and the Meyer NDA (**Exhibit 3**);

20.5    Meyer learned of the existence of Finn and EB and their business relationship with Precision through the same process. At a meeting with Precision's CEO on

FIRST AMENDED COMPLAINT

1    August 12, 2024, Charlie Meyer, CEO of Meyer, admitted that he had never heard of

2    a blower truck feeder until DHG, through Finn, approached Meyer and asked Meyer

3    to build Precision's 302 feeder for Finn. Charles Meyer also disclosed at the

4    August 12, 2024 meeting that, when Meyer asked for the drawings for the 302, Finn

5    admitted that it did not own or control the designs, so instead had to retain Meyer to

6    reverse engineer Precision's feeder designs and product specifications;

7    20.6    Using a Precision 302 feeder provided by Finn to Meyer for the purpose, Meyer

8    performed the reverse engineering, combined it with confidential information

9    obtained through the Meyer NDA disclosures, and provided Finn with a complete

10    drawing package for the feeder and a Meyer-built unit;

11    20.7    After obtaining the confidential information through the DHG NDA, DHG and the

12    DHG Companies, DHG/Three Cities, submitted commercially unreasonable

13    proposals to do business with Plaintiffs which were rejected by Plaintiffs;

14    20.8    After obtaining Precision's trade secrets and other confidential information through

15    the DHG NDA, DHG and the DHG Companies made no further orders of

16    Precision's airlock rotary feeders from Precision and instead, ordered such feeders

17    from Meyer without DHG or their agents entering into any license agreement or

18    otherwise compensating Plaintiffs for the disclosure and use of Precision's designs,

19    Trade Secrets and other confidential information; and

20    20.9    The DHG companies have defamed Plaintiffs by claiming that Plaintiffs have stolen

21    the DHG's Companies' designs while it is the DHG Companies who have

22    misappropriated and commercially exploited Plaintiffs' valuable intellectual

23    property concerning the airlock rotary feeders.

24    21.    The misconduct of DHG and their agents alleged in this Complaint constitutes

25    various breaches of duty, sounding in both contract and tort, including, but not limited to, breach of

26    contract, tortious interference with contracts, misappropriation of trade secrets/proprietary

27    information trade secret, unfair competition; and fraud, all of which entitles Plaintiffs to legal and

28    equitable relief, including but not necessarily limited to, an award of damages, disgorgement by

DHG and their agents of profits or benefits obtained from their misconduct, exemplary damages, reimbursement of attorney fees and litigation expenses incurred by Plaintiffs in protecting and enforcing their rights, a declaration of Plaintiffs' rights with respect to the rotary feeders, temporary restraining orders, preliminary injunctive relief and permanent injunctive relief, as hereinafter alleged in more detail.

22.    DHG's violations of the NDA have proximately and/or legally caused substantial economic loss, damage and harm to Plaintiffs in an amount in excess of the minimum jurisdictional limits of this Court and in an amount that will be determined according to proof at trial, including, but not limited to, by and through the following conduct:

22.1    By May of 2025, DHG and/or DHG's Companies had ordered 60 of Precision's feeders from Meyer and had discontinued placing any orders with Precision for the feeders;

22.2    DHG learned from the confidential information obtained from Plaintiffs pursuant to the DHG NDA that a former Precision customer, CAS, an independent manufacturing company which is a contract builder for Finn and Express Blower was purchasing feeders directly from Precision. When CAS's manufacturing agreement was up for renewal in 2024, Finn confronted CAS and forced CAS to agree to purchase all airlock rotary feeders through DHG's Companies rather than directly from Precision, even though Finn and EB's prices for the feeders are higher than Precision's; and

22.3    DHG and the DHG Companies have misappropriated and have been marketing and selling the Precision-designed airlock rotary feeders, including the Precision's 302 model feeder, as the DHG' Companies' own products without licensing from Plaintiffs or otherwise compensating Plaintiffs, all to the Defendants' benefit and the detriment of the true developers and owners of the design.

23.    By reason of the misconduct of DHG and DHG's Companies as DHG's agents in violating the DHG NDA, Plaintiffs are entitled to reimbursement by DHG and the DHG Companies of reasonable attorney fees, expert witness fees, and other litigation expenses incurred by Plaintiffs

weintraub tobin chediak coleman grodin
law corporation

in protecting and enforcing their rights pursuant to the NDA's (**Exhibit 2,** DHG NDA, p. 6, Sec. 19 "Attorneys' Fees") and federal and state statutes including, but not limited to, California Civil Code Section 3426.4.

24.    The misconduct of DHG and its affiliated companies constitute violations of the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*) and the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426.1, *et seq.*), has caused economic loss, damage and harm which is ongoing and the precise amount of which will be proven by evidence at trial, and entitles Plaintiffs to an award of monetary damages.

25.    The misappropriation and sharing by DHG of Precision's design, manufacturing processes, intellectual property, Trade Secrets, proprietary or Confidential Information associated with Precision's feeders was willful and the product of fraud, malice, oppression and/or conscious disregard of the Plaintiffs' rights, entitling Plaintiffs to an award of exemplary or punitive damages pursuant to the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*), the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426.1, *et seq.*), and California Civil Code §§ 3294 and 3436.3.

26.    The misappropriation of Precision's design, manufacturing processes, intellectual property, Trade Secrets and other proprietary and/or other Confidential Information associated with Precision's airlock rotary feeders has caused, continues to cause, and will continue to cause Plaintiffs irreparable harm by wrongfully excluding Precision from a large segment of the feeder market and by damaging Precision's reputation in the industry such that damages will not constitute adequate relief.  Plaintiffs are therefore entitled to temporary, preliminary and permanent injunctions prohibiting DHG from (1) marketing, manufacturing, or selling the Precision-designed airlock rotary feeders as DHG's own product; (2) disclosing in any way the Precision's IP and trade secrets concerning the airlock rotary feeders designed, engineered and developed by Precision without paying license fees, royalties or other compensation for such disclosure; (3) using in any way the designs for the airlock rotary feeders developed by Precision without paying license fees, royalties or other compensation for such use; (4) claiming that Plaintiffs have misappropriated

1   DHG's intellectual property; and/or (5) taking any action to prevent, restrain or impede Plaintiffs'

2   ability to derive benefit from Precision's services, products, trade secrets, techniques, processes,

3   operations, formulae, product specifications, compositions, inventions, discoveries, drawings and

4   designs for the airlock rotary feeders designed and developed by Precision since the company's

5   inception in 1977 and designed for use in blower truck and/or blower equipment..

6                                        **COUNT ONE**

7                                   (**Breach of the DHG NDA**)

8        27.     Plaintiffs hereby incorporate by this reference, as though realleged in this Count One

9   in full and verbatim, the allegations of paragraphs 1 through 26 of this Complaint.

10       28.     As alleged in more detail in paragraphs 14, 15, 15.1 and 15.2 of this Complaint,

11   DHG and the DHG Companies bound themselves, among other promises, to protect and to refrain

12   from disclosing to any third party any of Precision's Confidential Information, including but not

13   limited to Plaintiffs' Trade Secrets.

14       29.     Plaintiffs performed their obligations under the DHG NDA contract by providing

15   DHG and its affiliates access to Confidential Information which included data concerning its

16   processes, customers and competitors including such Confidential Information about the rotary

17   feeders DHG's Companies had been purchasing from Plaintiffs.

18       30.     As alleged in more detail in  paragraphs 20, 20.1 through 20.9 of this Complaint,

19   DHG by and through the DHG Companies breached the DHG NDA contract by informing third

20   parties, including customers and competitors of Plaintiffs of Confidential Information, that a

21   potential transaction was being contemplated, and by providing potential customer and competitor

22   Meyer with Precision's proprietary information concerning Precision's services, products, Trade

23   Secrets, techniques, processes, operations, formulae, product specifications, compositions,

24   inventions, discoveries, and designs, and by engaging Meyer to reverse engineer Precision's rotary

25   feeder coupled with such additional proprietary information, trade secrets and other Confidential

26   Information obtained from Precision through the DHG NDA.

27       31.     The breach of the DHG NDA by DHG and by and through DHG's Companies,

28   entitles Plaintiffs to an award of attorney fees and costs incurred by Plaintiffs in protecting and

weintraub **tobin** chediak coleman grodin
law corporation

1    enforcing their rights as alleged in paragraph 23 of this Complaint.  Such fees and expenses are

2    ongoing and increasing and the precise amount will be determined according to proof at trial.

3        32.    The breach of the DHG NDA by DHG and by and through DHG's Companies, has

4    proximately or legally caused Plaintiffs economic loss, damage and harm, which is ongoing and

5    increasing in an amount that will be determined according to proof at trial as described in

6    paragraphs 21 through 26 of this Complaint, and further entitles Plaintiffs to all other legal and

7    equitable remedies and relief described in such paragraphs.

8                              **COUNT TWO**

9                    (**Tortious Interference with Contract Against DHG**)

10       33.    Plaintiffs hereby incorporate by this reference, as though realleged in this Count

11   Two in full and verbatim, the allegations of paragraphs 1 through 32 of this Complaint.

12       34.    The Meyer NDA is, and was, a legally binding contract requiring, *inter alia*, that

13   Meyer protect and refrain from using or disclosing to third parties any proprietary information,

14   trade secrets and/or any other Confidential Information obtained from Precision.

15       35.    DHG and DHG's Companies knew or had reason to know of the existence and

16   principal terms of the Meyer NDA.

17       36.    The misconduct of DHG and DHG's Companies as DHG's agents in violating its

18   obligations under the DHG NDA, in collaborating with Meyer to share proprietary information,

19   trade secrets and/or other Confidential Information regarding customers and competitors of

20   Plaintiffs, to share design, cost and pricing information about Precision's rotary feeders, to reverse

21   engineer and develop a Meyer-built replica of Precision's rotary feeders and an accompanying

22   replica set of design drawings of such feeders for future use, and thereafter to induce and develop a

23   purchaser-seller relationship with Meyer whereby DHG would purchase feeders from Meyer which

24   Meyer produced using the pirated design, cost, production methods, price and other Confidential

25   Information obtained from Plaintiffs disrupted the Meyer NDA and therefore was, is, and

26   constitutes tortious interference on the part of DHG and its agents, the DHG Companies, with the

27   Meyer NDA contract between Plaintiffs and Meyer.

28   ///

**weintraub tobin** chediak coleman grodin
law corporation

37.     As a direct, proximate and legal result of such tortious interference with the Meyer NDA, Plaintiffs have suffered economic loss, damage and harm, which is ongoing and increasing in an amount that will be determined according to proof at trial as described in paragraphs 21 through 26 of this Complaint, and further entitles Plaintiffs to all other legal and equitable remedies and relief described in such paragraphs.

## COUNT THREE

### (**Misappropriation of Plaintiffs' Intellectual Property and Trade Secrets Against Defendant DHG**)

38.     Plaintiffs hereby incorporate by this reference, as though realleged in this Count Three in full and verbatim, the allegations of paragraphs 1 through 37 of this Complaint.

39.     At all times relevant to the allegations of this Complaint, Plaintiffs were the owners of trade secret information described more fully in paragraphs 20.2 through 20.2.9 above.

40.     At the time of the misappropriation of Precision's Trade Secrets by DHG, Precision's Trade Secrets which were unknown to anyone other than Plaintiffs, over which Plaintiffs exercised exclusive, which had independent economic value because of such secrecy and Plaintiffs' control, and which Plaintiffs took extensive and reasonable steps to protect from disclosure to third parties not authorized by Plaintiffs to receive such information.

41.     DHG improperly acquired, used, and disclosed to third parties not authorized to receive such information, Precision's Trade Secrets and other Confidential Information through the acts, omissions and conduct alleged in paragraphs 20, 20.1 through 20.8, 22, 22.1 through 22.3 of this Complaint.

42.     DHG's conduct violated federal and state statutes including, but not limited to, the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), and the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426.1, *et seq.*).

43.     As a direct, proximate and legal result of DHG's misconduct, Plaintiffs have suffered economic loss, damage, injury, detriment and harm and DHG has been unjustly enriched by DHG's acts depriving Plaintiffs of control over the use and disclosure of  Precision's trade secrets; by depriving Plaintiffs of royalties, license fees or other compensation that would otherwise

be payable by DHG to Plaintiffs for acquisition, use or disclosure of Precision's IP, Trade Secrets and/or other Confidential Information; by diverting from Precision to themselves sales of the Precision-designed and developed feeders; by defaming Plaintiffs to Precision's customers; and by wrongfully restraining, impairing and impeding Precision's ability to participate and compete in the market for such feeders.

44.    DHG's misconduct was a substantial factor in the loss, damage, injury, detriment and harm visited upon Plaintiffs and in the unjust enrichment of DHG.

45.    As a direct, proximate and legal result of such misappropriation of Precision's IP, Trade Secrets and/or other Confidential Information, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing in an amount that will be determined according to proof at trial and which entitles Plaintiffs to all other legal and equitable remedies and relief described in paragraphs 21 through 26 of this Complaint.

## COUNT FOUR

### (**Unlawful Business Practices and Competition Against Defendant DHG**)

46.    Plaintiffs hereby incorporate by this reference, as though realleged in this Count Four in full and verbatim, the allegations of paragraphs 1 through 45 of this Complaint.

47.    DHG's misconduct as alleged in this complaint constitutes engaging in unlawful business practices to the damage and detriment of consumers and Defendants' competitors, including Plaintiffs, in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200*, et seq.*).

48.    DHG's conduct was unlawful in that the misappropriation of Plaintiffs' Trade Secrets violated federal and state laws including, but not limited to, the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), and the California Uniform Trade Secrets Act (Cal. Civ. Code §§ 3426.1, *et seq.*).  DHG obtained Plaintiffs' Trade Secrets as described in Paragraphs 20.2 through 20.2.9, through the MOU and the DHG NDA.  DHG misappropriated Plaintiffs' Trade Secrets when it shared the information with Meyer and with others, and when it used the Trade Secrets to obtain and market feeders without paying license fees to Plaintiffs, and by using such information beyond the use permitted by the MOU and DHG NDA.

weintraub tobin chediak coleman grodin
law corporation

49.     DHG will continue to engage in such conduct and unlawful practices unless this Court orders Defendants to cease and desist or otherwise enjoins DHG and the DHG Companies from engaging in such conduct.

50.     As a direct, proximate and legal result of such unlawful business practices, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing in an amount that will be determined according to proof at trial and which entitles Plaintiffs to all other legal and equitable remedies and relief described in paragraphs 21 through 26 of this Complaint.

## COUNT FIVE

(**Fraudulent Business Practices and Competition Against Defendant DHG**)

51.     Plaintiffs hereby incorporate by this reference, as though realleged in this Count Five in full and verbatim, the allegations of paragraphs 1 through 50 of this Complaint.

52.     DHG's misconduct as alleged in this complaint constitutes engaging in fraudulent business practices to the damage and detriment of consumers and Defendants' competitors, including Plaintiffs, in violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).

53.     DHG's conduct was fraudulent in that DHG used a material misrepresentation, specifically that DHG was interested in entering into a transaction to acquire Precision, as a basis for entering into and executing the DHG NDA, when in fact DHG had no such interest but was instead planning to obtain Plaintiffs' Trade Secret and Confidential Information in order to obtain Precision's feeders from Meyer or another competitor at a price less than Precision's price and without paying Precision a license fee for using Precision's intellectual property and designs. Plaintiffs had no reason to know or suspect that DHG was not actually interested in entering into the transaction to acquire Precision, and reasonably relied on DHG's misrepresentation to execute the DHG NDA, disclose Precision's Trade Secrets to DHG, and provide all information DHG requested as part of negotiating the purported acquisition transaction.

54.     As a direct, proximate and legal result of DHG's fraudulent business practices and competition, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing in an amount that will be determined according to proof at trial and which entitles

weintraub **tobin** chediak coleman grodin
law corporation

1    Plaintiffs to all other legal and equitable remedies and relief described in paragraphs 21 through 26

2    of this Complaint.

3                                **COUNT SIX**

4                    (**Intentional Misrepresentation Against Defendant DHG**)

5           55.    Plaintiffs hereby incorporate by this reference, as though realleged in this Count Six

6    in full and verbatim, the allegations of paragraphs 1 through 54 of this Complaint.

7           56.    DHG represented that it would license Precision's designs, engineering and other

8    aspects of Precision's IP, Trade Secrets and other Confidential Information from Precision if the

9    business relationship established by and described in the MOU (**Exhibit 1**) ever became

10   unsatisfactory or terminated.

11          57.    DHG also represented that it was interested in entering into a transaction to acquire

12   Precision. DHG made this representation several times, including in an email from Christopher

13   Erickson to Don Lindsey on December 17, 2023, in which Mr. Erickson stated that Three Cities

14   Research, the investment firm that owns DHG, Inc., was "very interested in Precision Machine as

15   an acquisition." Mr. Erickson continued, "DHG, through Finn and Express Blower represents

16   Precision's largest customer, and I believe that the market, product, and operational knowledge of

17   these companies can be used to grow Precision Machine. In particular, there are growth

18   opportunities for an OEM airlock remanufacture business that would utilize the capabilities of both

19   Precision Machine as well as Finn and Express Blower."

20          58.    The true facts were that DHG and the DHG Companies had no intention of ever

21   licensing Precision's designs, engineering and/or other aspects of Precision's IP and trade secrets.

22   Moreover, they had no intention of ever actually acquiring Precision.  Instead, they intended to

23   obtain access to Plaintiffs' Trade Secrets and have Precision design, engineer and develop next-

24   generation airlock rotary feeders customized for use in DHG's Companies' products as a step in a

25   scheme to obtain control and use of such designs, intellectual property and trade secrets without

26   having to pay Plaintiffs for such control and use.

27          59.    DHG intended for Plaintiffs to rely on DHG's misrepresentations such that Plaintiffs

28   would execute the DHG NDA and provide DHG with Plaintiffs' Trade Secrets.  Plaintiffs

**weintraub tobin** chediak coleman grodin
law corporation

1   reasonably relied on the misrepresentations of Defendants and were induced to provide access to

2   such commercially valuable Confidential Information.  Plaintiffs' reliance was justified as they had

3   no reason to suspect, and did not suspect, that DHG's representations were false or what DHG's

4   actual goal was in obtaining Plaintiffs' Trade Secrets.  DHG, on the other hand, knew their true

5   intentions, and knew the representations were false when they were made.

6        60.    As a direct and proximate result of such intentional misrepresentations, DHG and the

7   DHG Companies obtained such commercially valuable Confidential Information and Trade Secrets,

8   and Plaintiffs have suffered economic loss, damage, injury, detriment and harm, and DHG has been

9   unjustly enriched by DHG's acts depriving Plaintiffs of control over the use and disclosure of

10  Precision's IP, Trade Secrets and other Confidential Information; by depriving Plaintiffs of

11  royalties, license fees or other compensation that would otherwise be payable by DHG to Plaintiffs

12  for acquisition, use or disclosure of Precision's IP, Trade Secrets and other Confidential

13  Information; by diverting from Precision to themselves sales of the Precision-designed and

14  developed airlock rotary feeders; by defaming Plaintiffs to Precision's customers; and by

15  wrongfully restraining, impairing and impeding Precision's ability to participate and compete in the

16  market for such feeders.

17       61.    As a direct and proximate result of such intentional misrepresentations, Plaintiffs

18  have suffered economic loss, damage and harm which is ongoing and increasing in an amount that

19  will be determined according to proof at trial and which entitles Plaintiffs to all other legal and

20  equitable remedies and relief described in paragraphs 21 through 26 of this Complaint.

21                                    **PRAYER**

22       WHEREFORE, Plaintiffs pray for judgment and orders against DHG as follows:

23       A.     For monetary damages awarded to Plaintiffs for any and all economic loss, damage,

24  injury and/or harm proximately or legally caused by DHG's conduct;

25       B.     For disgorgement or restitution by DHG of any and all benefit obtained by DHG

26  from their wrongful conduct;

27  ///

28  ///

weintraub tobin chediak coleman grodin
law corporation

C.      That DHG and their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

(1)      Marketing, manufacturing, or selling the Precision-designed airlock rotary feeders as DHG's own product;

(2)      Disclosing in any way the Precision's IP and trade secrets concerning the airlock rotary feeders designed, engineered and developed by Precision without paying license fees, royalties, or other compensation for such disclosure;

(3)      Using in any way the Precision's IP and trade secrets concerning the airlock rotary feeders designed, engineered and developed by Precision without paying license fees, royalties or other compensation for such use;

(4)      Claiming that Plaintiffs have misappropriated DHG's intellectual property related to such airlock rotary feeders; and/or

(5)      Taking any action to prevent, restrain or impede Plaintiffs' ability to derive benefit from Precision's services, products, trade secrets, techniques, processes, operations, formulae, product specifications, compositions, inventions, discoveries, drawings and designs for any of the airlock rotary feeders designed and developed by Precision since the company's inception in 1977 and designed for use in blower trucks and/or blower equipment.

D.      For an award of punitive or exemplary damages in an amount sufficient to punish DHG and deter future wrongful conduct;

E.      For an order requiring DHG and its affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them to destroy and dispose of Precision's IP and trade secrets and other Confidential Information obtained from precision, including, but not limited to, all designs, programs, fixturing, drawings, and/or documentation that are associated with and/or derived from the reverse engineering of the Precision's rotary airlock feeder;

///

///

1    F.    For an award to Plaintiffs of reasonable attorney fees, costs and related expense

2 incurred in prosecution of this Complaint; and

3    G.    For such other and further relief as the Court deems just and proper.

4

5 Dated:  January 29, 2026                    **Weintraub Tobin** Chediak Coleman Grodin

6                                              LAW CORPORATION

7

8                                              By:  /s/ Zachary M. Smith
                                                    Zachary M. Smith

9                                              Attorneys for Plaintiffs PMM Holdings, LLC and
                                               Precision Machine & Manufacturing
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1

# Memorandum of Understanding

| | |
|---|---|
| Date: | February 8, 2016 |
| Between: | FINN Corporation and Express Blower |
| | Precision Machine & Manufacturing, Inc. |
| Subject: | Blower truck feeder supply |

The following subjects have been discussed and agreed among the parties and are meant to address the major elements of the working relationship between the companies as supplier (Precision) and customer (FINN and EB) as it relates to the supply of rotary feeders for the FINN and EB blower truck product lines.

The companies agree that they will work cooperatively to resolve any misunderstandings relating to any of the subjects addressed in this Memo. Similarly, the companies agree to cooperatively resolve any issues not addressed here.

Products

At present, there are five feeder products that are the subject of this Memo. The part numbers and basic descriptions are in the Initial Pricing section of this Memo. There is no obligation for FINN and EB to buy all of their feeders from Precision. The minimum lot size orders, minimum annual purchases, and annual rebates – all of which relate to the expected or anticipated feeder purchases are described elsewhere in this Memo.

If new feeder models are developed, the companies will incorporate the potential supply of those feeders under these same terms as closely as possible and appropriate.

Similarly, if the companies expand the supplier/customer relationship to include other products manufactured by Precision, the companies will work together to incorporate the supply of those products under these same terms as closely as possible and appropriate.

Design Changes

The companies have not made a detailed comparison of the feeders currently being purchased by FINN and EB with those currently being produced by Precision. ████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████

There is general agreement between the companies that the line-up of feeders are very comparable. FINN and EB have expressed a preference for Precision to control the overall design of the feeders and Precision has agreed to accept this responsibility. The companies intend to work cooperatively on any

changes to the design, materials of construction, or manufacturing techniques in order to assure that the products meet the expectations of FINN and EB's customers.

Significant design, material, or manufacturing techniques changes requested by FINN or EB may lead to an adjustment to the pricing but the companies agree to discuss any such changes or adjustments to pricing in advance and that neither company will attempt to make such changes unilaterally.

Initial Pricing



Precision normally adjusts pricing on all its products annually. Given the prospective volumes in the relationship with FINN and EB, Precision will agree to hold the initial OEM prices unchanged for 24 months from the date of the first order. The companies agree to meet after 24 months and discuss pricing.

Packaging, Delivery Point, & Shipping

All feeders will be sold FOB Precision's factory in Eugene, Oregon. Any feeder destined for the EB facility in Eugene, Oregon will be delivered by Precision truck. For shipments bound for the FINN facility in Fairfield, Ohio, FINN will specify the mode of transport and will arrange the transportation.

Precision will palletize the feeders for shipment, strap the feeders to the pallets, and wrap the feeders in plastic.

Payment Terms

Standard payment terms will be 30 days net, 10 days 1%. The companies agree that they will discuss deviations from the standard payment terms if circumstances require modifications.

Minimum Lot Size Order

Minimum lot size orders are shown in the Initial Pricing section of this Memo. The companies have agreed that early shipments of less than a full minimum lot size order can generally be arranged depending on Precision's production schedule.

Lead Time

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████

Annual Rebate

Beginning in 2016, Precision will provide an annual rebate to FINN and EB according to table shown below. The annual rebate is based on calendar year purchases and includes purchases of new feeders, reconditioned or rebuilt feeders (if any), replacement parts (if any); and excludes shipping. The annual rebate will paid in a check or issued as an open credit (FINN's option) in January for the previous year.



Minimum Annual Purchases

Precision's pricing is based on a volume leverage in its manufacturing operations and with its vendors. The companies have agreed that purchases for a calendar year of thirty (30) feeders is adequate to allow Precision to exert the necessary leverage to support the prices offered. If calendar year purchases fall below thirty (30), the companies will discuss demand factors and any other reasons for the low demand and whether or not a change to the pricing schedule is in order due to the low demand.

Warranty & Warranty Administration

Precision agrees to conform its warranty to FINN and EB to the warranty offered to FINN and EB's customers: 12 months or 1000 hours, whichever comes first. The warranty on the Precision-supplied feeders will commence on the date of sale of the feeder to FINN or EB's customer. FINN and EB agree to maintain complete records of shipment dates by serial number for all Precision-supplied feeders. FINN and EB will administer the warranty with their customers and will advise Precision of any warranty claims asserted.

Aftermarket

Upon commencement of the business relationship between Precision and FINN/EB, Precision will withdraw from the business of supplying feeders into the blower truck aftermarket. Precision will remove references to blower truck feeders from its website, brochures, and other marketing materials.

Precision will direct any customer inquiries that it receives to FINN and EB and will, if asked, inform customers that Precision is now supplying feeders to FINN and EB.

Provided that both companies are satisfied with the business relationship and provided that the annual minimum order volume is being met, Precision pledges to stay out of the blower truck feeder aftermarket and not compete with Finn and EB for blower truck feeder sales, parts sales, service, or rebuilding. If the working relationship between the companies ever comes to an end, Precision commits

to remaining out of the aftermarket business for a minimum of two years following the date of its last shipment to FINN and EB.  During this two-year period, Precision agrees that it will license its designs for rotary feeders to FINN and EB on the basis of terms to be negotiated later.

Precision agrees that as long as it remains a supplier to FINN and EB and that annual minimum purchases are being achieved, and for the ⬛⬛⬛⬛ after the business relationship ends, if it does, that Precision will not supply feeders to any other blower truck feeder manufacturer or developer.

Non-Disclosure

Both companies agree to protect the confidentiality of the designs, the pricing, volumes, and any other information about their business relationship with the same care that they safeguard other information about their respective businesses.

FINN and Express Blower

Precision Machine & Manufacturing

_____

Matt Day, Vice President of Operations

_____

Kirk Morton, President

**Exhibit 2**

<u>**PRECISION MACHINE & MANUFACTURING, INC.**</u>

January 23, 2024

<u>**CONFIDENTIAL**</u>

Christopher Erickson
DHG, Inc.
Three Cities Research, Inc.,
135 East 57th Street, 15-103
New York, NY 10022

Dear Christopher Erickson:

This Non-Disclosure Agreement (this **"Letter Agreement"**) is entered effective as of January 23, 2024 (the **"Effective Date"**) by and between Precision Machine & Manufacturing, Inc. (the **"Company"**) and each of DHG, Inc. and Three Cities Research, Inc. (collectively "**you**", "**your**" and collectively with the Company, the "**Parties**" and each a "**Party**") in connection with the consideration of a possible transaction between the Parties. The Company has furnished or may furnish to you certain information that is proprietary, non-public or confidential concerning the operations of the Company or its affiliates or subsidiaries. Any such possible negotiated transaction involving the Parties is referred to herein as a **"Transaction."**

1.    <u>Confidential Information</u>. As a condition to the Company furnishing Confidential Information (as defined below) to you, you agree to not disclose any Confidential Information (whether prepared by a Party, its affiliates, subsidiaries, agents or advisors or otherwise, and whether oral, written or electronic) that the Company or its Representatives (as defined below), furnishes to you or your Representatives, or is otherwise ascertained by you or your Representatives, including through due diligence investigation or discussions with employees or other Representatives of the Company, together with all analyses, summaries, notes, forecasts, studies, data and other documents and materials in whatever form maintained whether prepared by the Company or you or the Company's or your respective Representatives or others, which contain or reflect, or are generated from, any such information (such information, together with the Transaction Information (as defined below), being collectively referred to herein as the **"Confidential Information"**), and to take or abstain from taking certain other actions set forth herein.

2.    <u>Exclusions from Confidential Information</u>. Other than with respect to any Transaction Information, the term **"Confidential Information"** does not include information that (i) is already in your possession, provided that such information is not known by you, after reasonable inquiry, to be subject to a legal, fiduciary, confidentiality, contractual or other obligation to the Company or its affiliates, (ii) is or becomes generally available to the public other than as a result of a disclosure, or any other act or omission, by you or your Representatives in violation of the terms hereof, (iii) is or becomes available to you on a non-confidential basis from a source other than the Company or its Representatives, provided that such source is not known by you, after reasonable inquiry to be bound

by a legal, fiduciary, confidentiality, contractual or other obligation to the Company or its affiliates, or (iv) was developed independently by you without the use of or reference to the Confidential Information.

3.     Nondisclosure and Limited Use. You hereby agree that the Confidential Information will be used by you and your Representatives solely for the purpose of evaluating, proposing or negotiating a possible Transaction and for no other purpose and will not be disclosed to any third parties and will be kept confidential by you and your Representatives; *provided, however,* you may disclose Confidential Information only to such of your Representatives who need to know such information solely for the purpose of assisting you in evaluating any such possible Transaction, who are advised of the confidential nature of the Confidential Information and who agree or are obligated to keep such information confidential in accordance with the terms hereof or greater restrictions. You will be responsible and liable for any breach of this Letter Agreement by you or your Representatives, provided that you shall not be responsible for any breach of this Agreement by any of your Representatives who has entered into a separate confidentiality agreement or a joinder agreement with the Company. The Confidential Information shall remain the property of the Company, and disclosure to you or your Representatives shall not confer on you or your Representatives any rights with respect to such Confidential Information other than rights specifically set forth in this Letter Agreement. You understand that some Confidential Information deemed competitively sensitive may be designated for review solely by your outside advisors or by a limited number or category of your employees designated between us in writing, and you agree to, and to cause your Representatives to, abide by such designation.

4.     Transaction Information. Without the prior written consent of the Company, you will not, and will cause your Representatives not to, disclose to any person: (i) the fact that the Confidential Information has been made available to you, (ii) the fact that investigations, discussions or negotiations may take place, are taking place or have taken place concerning a possible Transaction involving you and the Company, (iii) any of the terms, conditions or other facts with respect to any such possible Transaction, including the status or timing thereof or either Party's consideration of a possible Transaction, (iv) that the Parties or any of their respective affiliates or subsidiaries are, have been or may be considering or reviewing a transaction involving or relating to the other Party, or (v) that this Letter Agreement exists or that Confidential Information has been or may be requested or made available to you or your Representatives, except that you may make any such disclosure to the extent that such disclosure is required by applicable law or stock exchange agreements or regulations but only after notice and consultation with the Company (the information of the types referred to in clauses (i) to (v) being collectively referred to herein as "**Transaction Information**"). Your obligations in the preceding sentence shall survive any return or destruction of the Confidential Information pursuant to the provisions hereof.

5.     Compelled Disclosure. In the event that you or any of your Representatives receive a request, or are legally required, to disclose all or any part of the information contained in the Confidential Information (or to make any disclosure otherwise prohibited hereby) under the terms of a subpoena or order issued by a court or governmental or regulatory body of competent jurisdiction or under any applicable law, governmental proceeding or stock exchange rule, you agree to, and to cause your Representatives to, (i) except to the extent prohibited by law, immediately notify the Company of the existence, terms and circumstances surrounding such a request or requirement so that it may seek an appropriate protective order and/or waive your or your Representatives' compliance with the provisions of this Letter Agreement (and, if the Company seeks such an order, to provide such commercially reasonable cooperation as the Company shall request

at its expense) and (ii) if, following the failure of the Company to obtain such protective order and to provide such a waiver, disclosure of such information is required in the opinion of outside legal counsel, exercise commercially reasonable efforts to obtain an order or other reliable assurance that confidential treatment will be accorded to such of the disclosed information which the Company so designates, and you and your Representatives shall then be permitted to disclose only that portion of the Confidential Information that is legally required to be disclosed.

6.    <u>No Representations or Warranties</u>. You understand that neither the Company nor any of its Representatives have made or make any express or implied representation or warranty as to the accuracy or completeness of the Confidential Information, and the Company and such other persons expressly disclaim any and all liability to you or any other person that may be based upon or relate to (i) the use of the Confidential Information by you or any of your Representatives or (ii) any errors therein or omissions therefrom. Only those representations or warranties that are expressly set forth in any definitive agreement with respect to any Transaction, when, as, and if it is executed and delivered, and subject to such limitations and restrictions as may be specified in such definitive agreement, will have any legal effect. You also agree that neither the Company nor its Representatives shall have any liability to you or your Representatives or any other person on any basis (including, without limitation, in contract, tort, under federal or state securities laws or otherwise), and neither you nor your Representatives will make any claims whatsoever against the Company or any of its Representatives, with respect to or arising out of: a possible Transaction, as a result of this Letter Agreement or any other written or oral expression with respect to a possible Transaction; the participation of you or your Representatives in evaluating a possible Transaction; the review of or use or content of the Confidential Information or any errors therein or omissions therefrom; or any action taken or any inaction occurring in reliance on the Confidential Information, in each case, except as and to the extent it may be expressly set forth in any definitive agreement with respect to any Transaction.

7.    <u>Return and Destruction of Confidential Information</u>. At the request of the Company, you and your Representatives shall promptly, and in any event within thirty (30) days of such request, at your election, either redeliver to the Company the Confidential Information whether in written, electronic or other form or media, received from or on behalf of the Company or destroy all such copies of the Confidential Information, including all reproductions thereof, then in your or your Representatives' possession. In either event, you shall also destroy all written or electronic data developed or derived from the Confidential Information, and shall cause your Representatives to do the same. All destruction pursuant to this paragraph shall be certified in writing (email being sufficient) to the Company by an authorized officer supervising such destruction. In any such event, all Confidential Information shall nonetheless remain subject to the terms of this Letter Agreement. Notwithstanding the foregoing, the obligation to return or destroy Confidential Information shall not cover information that is (i) automatically maintained on routine computer system backup tapes, disks or other backup storage devices or (ii) to the extent required to be retained by law or regulation as long as such backed-up information is not used, disclosed, or otherwise recovered from such backup devices; *provided* that such materials referenced in this sentence shall remain subject to the confidentiality and use restrictions of this Letter Agreement applicable to Confidential Information.

8.    <u>Waiver</u>. It is further understood and agreed that no failure or delay by the Company in exercising any right, power or privilege under this Letter Agreement shall operate as a waiver thereof, nor shall any single or partial exercise preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

9.      No Obligation for Transaction; Relationship Created. The Parties understand and agree that unless and until any definitive agreement with respect to any Transaction has been executed and delivered by the Parties, neither of the Parties nor any of their affiliates or subsidiaries will be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this or any written or oral expression with respect to such Transaction by any of its directors, officers, employees, agents or any other Representatives, except for the matters specifically agreed in this Letter Agreement. No contract or agreement providing for a Transaction shall be deemed to exist unless and until a definitive agreement has been executed and delivered by each of the Parties thereto, and the Parties hereby waive, in advance, any claims (including, without limitation, breach of contract claims providing for a Transaction) in connection with such a Transaction unless and until a definitive agreement has been executed and delivered by each of the Parties thereto. Nothing in this Letter Agreement shall be construed as establishing a joint venture, partnership or other contractual arrangement with regard to the Confidential Information, or as granting any rights to you under any license, patent or copyright.  Nor shall this Letter Agreement be construed to grant you any rights in or to any of the Confidential Information, except the limited right to review such Confidential Information solely for the purpose described herein.  You shall not enter into any agreement on behalf of the Company and shall have no authority to obligate the Company. You further acknowledge and agree that the Company shall be free to conduct the process, if any, for a Transaction as it determines in its sole discretion, , that the Company has not, as of the date hereof, authorized or made any decision to pursue or engage in any such Transaction and that the Company reserves the right, in its sole and absolute discretion and without giving any reason therefor, to change the procedures relating to your consideration of a Transaction at any time without prior notice to you or any other person. For purposes of this Letter Agreement, the term **"definitive agreement"** does not include an executed term sheet or letter of intent or any other preliminary written agreement, nor does it include any written or oral offer or bid or any written or oral acceptance thereof. This Letter Agreement does not constitute or create any obligation of the Company to provide any Confidential Information or other information to you, but merely defines the rights, duties and obligations of the Parties with respect to Confidential Information to the extent it may be disclosed or made available. This Letter Agreement may be modified or waived only by a separate writing between the Parties setting forth an express modification or waiver.

10.     Requests for Information; Discussions. Neither you nor any of your Representatives will initiate or cause to be initiated any (i) communication concerning the Confidential Information; (ii) requests for meetings with management in connection with a potential Transaction; or (iii) other communication relating to the Company or its subsidiaries (other than in the ordinary course of business independent of a potential Transaction such as to manage the commercial relationship that currently exists between DHG controlled companies and Precision Machine) or a potential Transaction, in each case with any Representative of the Company or any of its subsidiaries who has not been designated by the Company in writing as a participant in discussions or diligence regarding the Transaction. Neither you nor any of your Representatives acting on your behalf shall contact or communicate with any of the directors, officers, affiliates, employees, customers, suppliers, distributors, joint venture partners, licensees and licensors of the Company or any of its subsidiaries about a possible Transaction, Confidential Information (except in the ordinary course of business unrelated to a possible Transaction) or Transaction Information, unless approved in advance and in writing by a previously authorized contact person within the Company.

11.     Non-Circumvention. You also agree that, for a period of two (2) years from the date of this Letter Agreement, without the Company's prior written consent, you and your controlled

affiliates will not, directly or indirectly, (i) solicit for purposes of employment, offer to hire, hire, or enter into any employment contract with, any management-level employee of the Company or any of its affiliates or subsidiaries, or any other employee of the Company or any of its affiliates or subsidiaries with whom you came in contact with in connection with a potential Transaction, or (ii) otherwise solicit, induce or encourage any such person to discontinue or refrain from entering into any employment relationship (contractual or otherwise) with the Company or any of its affiliates or subsidiaries; provided, that the foregoing clauses (i) and (ii) shall not restrict general advertising or other general solicitation not targeted to the employees of the Company or its affiliates or subsidiaries, or (iii) intentionally interfere with the relationship between the Company or its affiliates or subsidiaries and any customer or supplier of the Company (including by encouraging or inducing such customer or supplier to terminate or reduce the scope of its relationship with the Company or its affiliates or subsidiaries). The parties acknowledge that companies controlled by DHG are current customers of Precision Machine, and that this section does not restrict or constrain in any way DHG's ability to manage or modify the terms, nature, or scale of its existing commercial relationship with Precision Machine in the future provided that no use or disclosed is made of the Confidential Information.

12.  <u>Privilege and Work-Product</u>. You acknowledge that the Company may be entitled to the protections of the attorney work-product doctrine, attorney-client privilege or similar protections or privileges with respect to portions of the Confidential Information. The Company is not waiving, and will not be deemed to have waived or diminished, any of its attorney work-product protections, attorney-client privileges or similar protections or privileges as a result of the disclosure of such Confidential Information pursuant to this Letter Agreement. The Parties (i) share a common legal and commercial interest in such Confidential Information, (ii) are or may become joint defendants in proceedings to which such Confidential Information relates and (iii) intend that such protections and privileges remain intact should either Party become subject to any actual or threatened proceeding to which such Confidential Information relates.

13.  <u>Remedies</u>. You agree that the Company may be irreparably injured by a breach of this Letter Agreement by you or your Representatives and that money damages are an inadequate remedy for an actual or threatened breach of this Letter Agreement because of the difficulty of ascertaining the amount of damage that will be suffered by the Company in the event that this Letter Agreement is breached. Therefore, you agree that the Company shall be entitled to seek specific performance of this Letter Agreement and injunctive or other equitable relief in favor of the Company as a remedy for any such breach, without proof of actual damages. You further agree to waive any requirement for the securing or posting of any bond in connection with any such remedy and that the granting of such relief shall not be opposed on the basis that the Company has an adequate remedy at law. Such remedy shall not be deemed to be the exclusive remedy for you or your Representatives breach of this Letter Agreement, but shall be in addition to all other remedies potentially available at law or equity to the Company.

14.  <u>Term of Agreement</u>. Except as otherwise expressly provided herein, this Letter Agreement shall expire and be of no further force or effect from and after the second (2nd) anniversary hereof. This Letter Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and assigns. This Letter Agreement contains the entire agreement between the Parties concerning the subject matter hereof and supersedes all previous agreements, written or oral, between the Parties or their respective affiliates, relating to the subject matter hereof. You may not assign this Letter Agreement, in whole or in part, without the prior written consent of the Company. The Company may assign this Letter Agreement, provided that it remains liable for its obligations

herein.

15.    <u>Severability</u>. If any term, provision, covenant or restriction of this Letter Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Letter Agreement shall remain in full force and effect to the fullest extent permitted by law and shall in no way be affected, impaired or invalidated.

16.    <u>Governing Law</u>. This Letter Agreement shall be governed by, and construed in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of laws thereof. You irrevocably submit to (i) the exclusive jurisdiction of the state and federal courts in the State of California for purposes of any suit, action or other proceeding arising out of this Letter Agreement, or of the transactions contemplated hereby, that is brought by or against you, and (ii) the exclusive venue of such suit, action or proceeding in the State of California. You hereby irrevocably and unconditionally waive any objection to the laying of venue of any action, suit or proceeding arising out of this agreement or the transactions contemplated hereby in the above-named courts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

17.    <u>Other Definitions</u>. For purposes of this Letter Agreement, (i) the term "**Representatives**" means the directors, officers, employees, potential financing sources, investment professionals, agents or advisors (including, without limitation, attorneys, accountants, consultants, bankers and financial advisors), affiliates, partners, or representatives of a Party and of its affiliates,; and (ii) the term "**person**" shall be broadly interpreted to include the media and any corporation, partnership, group, governmental body, individual or other entity.

18.    <u>Notices</u>.  All notices and communications pursuant to this Letter Agreement shall be given in writing by personal delivery, prepaid first class registered or certified mail properly addressed with appropriate postage paid thereon, or electronic transmission with receipt confirmed, and shall be deemed to be duly given and received on the date of delivery if delivered personally, on the second day after the deposit in the United States Mail if mailed, or upon acknowledgment of receipt of electronic transmission.  Notices shall be sent to the Parties at the addresses set forth herein to such other address as any Party may have furnished to the other in writing in accordance herewith, except that notices of change of address shall only be effective upon receipt.

19.    <u>Attorneys' Fees</u>. In the event of any litigation relating to this Agreement, the prevailing party as determined by a court of competent jurisdiction in a final non-appealable order shall be reimbursed by the non-prevailing party for its commercially reasonable, documented and out-of-pocket costs and expenses, including legal fees, incurred in connection with such litigation, including any appeal therefrom.

20.    <u>Headings</u>. All paragraph headings are for reference only and shall not be considered in construing this Letter Agreement.

21.    <u>Integrated Agreement, Modification</u>. This instrument contains the entire agreement of the Parties and cannot be amended or modified except by a written agreement, executed by each of the Parties hereto.  This Letter Agreement supersedes all prior and/or contemporaneous

agreements and understandings between the Parties, written or oral, with respect to the Confidential Information described herein. This Letter Agreement may be executed in counterparts, each of which shall be deemed to be an original, but both of which shall constitute the same agreement. Signatures to this Letter Agreement transmitted by facsimile transmission, by electronic mail in "portable document format" (.pdf) form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing the original signature.

If you agree to the foregoing, please so indicate by signing and returning one copy of this Letter Agreement, which will constitute our agreement with respect to the matters set forth herein.

Very truly yours,

Precision Machine & Manufacturing, Inc.

By: _____
      Name: Chris Carleson
      duly authorized representative of Precision
      Machine & Manufacturing, Inc.

Accepted, Confirmed and Agreed:

DHG, Inc.

By: _____
      Name: Christopher Erickson, Director

Three Cities Research, Inc.

By: _____
      Name: Christopher Erickson, Partner

[Signature Page to Confidentiality Agreement]

**Exhibit 3**

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made as of _____May 7th_____, 2024 by and between **Project Rotary (Client #361)** (the, "Company") and __Charles Meyer - Wm. W. Meyer & Sons__ ("Recipient").

1. <u>Purpose</u>. Crown Point Partners, LLC ("Crown Point") is acting as exclusive financial advisor for the Company and its equity holders in connection with a possible negotiated acquisition or other investment transaction between the Company and the Recipient (the "Transaction"), and the Company wishes to provide directly and to have Crown Point furnish certain proprietary information concerning the Company to Recipient for the sole purpose of facilitating Recipient's evaluation, negotiation, documentation or consummation of the Transaction (the "Purpose").

2. <u>Confidential Information.</u> For purposes of this Agreement, the term "Confidential Information" means any and all information of a confidential nature disclosed to Recipient by or on behalf of the Company, orally, in writing or in any other medium, however documented (or not documented) and whether or not marked "Confidential." "Confidential Information" includes, without limitation, information regarding the Company's actual or proposed businesses; historical and projected financial information, budgets, services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, processes, compositions, inventions, discoveries, designs, sketches, drawings, samples, formats, marketing and manufacturing plans and materials, analyses, strategies, forecasts, research and development; concepts, ideas, names, addresses and any other characteristics, identifying information or aspects of the Company's existing or potential customers, employees, vendors or suppliers, this Agreement and its contents; or any information derived, summarized or extracted from any of the foregoing. "Confidential Information" shall not include any information that: (a) is or becomes available to the public other than as a consequence of a breach of this Agreement by Recipient or its Representatives (as defined below), or (b) Recipient or its Representatives received from a source not bound by obligations of confidentiality with respect thereto, or (c) Recipient or its Representatives developed independently without reliance upon the Confidential Information, or (d) is in Recipient's possession or in the possession of its Representatives prior to the date hereof on a non-confidential basis.

3. <u>Disclosure and Use Restrictions.</u> Recipient hereby agrees to and to direct its Representatives to, hold in confidence and trust all Confidential Information and not to disclose or otherwise provide or transfer, directly or indirectly, any Confidential Information to any third party (except as permitted herein) without the prior written consent of the Company; provided, however, that Recipient may disclose Confidential Information to those of its affiliates and its and their respective principals, directors, officers, employees, attorneys, accountants, financial advisors, consultants and other advisors on a "need to know" basis (any of the foregoing that receive Confidential Information from or on behalf of Recipient, its "Representatives"), and then only to the extent necessary to effect the Purpose. Recipient further agrees that it and its Representatives may use the Confidential Information only in connection with the Purpose. Recipient agrees to direct its Representatives to comply with the terms of this Agreement applicable to its Representatives and further agrees to be responsible for any breach of the terms of this Agreement applicable to its Representatives by its Representatives, including their failure to follow any direction required to be given by Recipient under this Agreement. Recipient hereby agrees that, in the event it or its Representatives become subject to an order issued by any court or other governmental entity requiring Recipient or such Representatives to turn over any Confidential Information, it shall, to the extent legally permitted, give the Company prompt notice of such order and shall provide commercially reasonable cooperation to the Company in its efforts to protect the confidentiality of such information at the Company's expense and subject to compliance with all applicable laws and court orders. Recipient shall then be permitted to disclose only that portion of the Confidential Information that is legally required to be disclosed. Notwithstanding any other provision of this Agreement, no prior notice or other action shall be required in respect of any disclosure made to any banking, financial, accounting, securities or similar supervisory authority exercising its routine supervisory or audit functions, provided that such disclosure is made in the ordinary course and is not specific to the Company, the Transaction or the Confidential Information.

4. <u>Destruction of Confidential Information.</u> If requested in writing by the Company or Crown Point, Recipient agrees to and to direct its Representatives to, promptly destroy all written Confidential Information received from or on behalf of the Company, including any and all copies or duplicates of such Confidential Information, and all summaries or extracts thereof in any medium prepared by or on behalf of Recipient. Upon written request by the Company or Crown Point, Recipient further agrees to deliver a written confirmation from a responsible representative of Recipient that it has fulfilled its obligations under this Section. Notwithstanding the foregoing, Recipient and its Representatives shall be entitled to retain any Confidential Information to the

extent necessary to comply with any applicable legal, regulatory or compliance policies or procedures, including its and their standard data archival procedures, provided that such retained Confidential Information shall continue to be subject to the confidentiality obligations under the term of this Agreement, and nothing shall require the erasure, deletion, alteration or destruction of back-up tapes and other back-up media made in the ordinary course of business.

5.   Non-Disclosure of Business Relationship. In addition to the foregoing disclosure and use restrictions regarding Confidential Information, Recipient agrees that it will and will direct its Representatives to, keep strictly confidential and not, without the prior written consent of the Company, disclose to any third party (other than its Representatives) the existence or any aspect of any ongoing negotiations, discussions or business dealings between the Company and Recipient concerning a Transaction; provided, however, that Recipient may make a public announcement of such agreement (the form and substance of which shall have been approved by the Company, which approval shall not be unreasonably withheld) at such time as the parties complete a Transaction or at such earlier time as may be required under applicable securities laws. Except as required by law, Crown Point and the Company agree that they will, and will direct their respective representatives to, keep the existence and terms of any documents and other information (including without limitation any investment proposal letters and term sheets) provided by or on behalf of Recipient to Crown Point or the Company or any of their respective representatives in connection with the proposed Transaction strictly confidential and not disclose the same to any third parties in any manner whatsoever. Crown Point and the Company shall be responsible for any breach of this section by any of their respective representatives.

6.   Non-Solicitation of Employees. Recipient agrees that, for a period of one (1) year after the date hereof, it will not directly or indirectly through its affiliates who have received or been made aware of the Confidential Information solicit to hire, or hire, as an employee or consultant, any persons currently employed by the Company; provided, however, that nothing contained herein shall be construed to prohibit Recipient from (a) placing general advertisements for employment, or recruiting through employment agencies (so long as Recipient does not direct such agencies to solicit the Company's employees) any person (including any employee of the Company) as a result thereof, or (b) soliciting or hiring any person whose employment with the Company has been terminated at least 180 days prior to the commencement of any such solicitation or employment discussions between Recipient and such person.

7.   Communication. Recipient agrees to and to direct its Representatives acting on its behalf to, maintain all communications regarding the Transaction with the Company only through Crown Point or the controlling shareholder.

8.   Crown Point. Any agreement for Company's purchase shall recognize Crown Point's right to be paid by the Company or its shareholders.

9.   No Assurances or Obligations. Although the Company believes the Confidential Information is accurate, neither it nor Crown Point makes any representations or warranties as to its accuracy, completeness or fairness, and neither shall have any liability for any express or implied representations or omissions in the Confidential Information. Nothing contained in this Agreement shall be deemed to create a business relationship between the parties or obligate either party to enter into further discussions and/or agreements with the other except as provided in any definitive agreement with respect to a Transaction between the parties.

10.  Irreparable Harm. Recipient acknowledges that the Confidential Information and all rights thereto belong to the Company and nothing contained in this Agreement shall be construed as transferring any right or license to the Confidential Information to Recipient, except the limited right to review the Confidential Information in connection with the Purpose. Recipient further understands that, in the event it fails to comply with this Agreement, the Company may suffer irreparable harm for which it may not be adequately compensated by monetary damages alone. Recipient agrees that, in the event of any breach or threatened breach of this Agreement, the Company will be entitled to seek injunctive and/or other preliminary or equitable relief, in addition to any other remedies available at law and without the obligation to post a bond.

11.  Jurisdiction. Service of Process. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought in the courts of the State in which the Company's principal place of business is located and within the metropolitan area nearest such place of business, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue in connection therewith. Process in any such action or proceeding may be served on any party anywhere. Recipient hereby waives any requirement that the Company proves the economic value of any Confidential Information or posts a bond or other security in connection with the enforcement of its rights hereunder.

12. <u>Miscellaneous.</u> The validity, interpretation, construction and enforcement of this Agreement shall be governed by the laws of the State in which the Company's principal place of business is located. This Agreement contains the entire understanding between the parties relating to this subject matter and supersedes all oral or written agreements between them with respect thereto, and no previous written or oral understandings have been or shall be relied upon. The failure of any party in any one or more instances to insist upon strict performance of any terms or provisions of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment to any extent of the right to assert or rely upon any such terms, provisions or options on any future occasion. To the extent any provision of this Agreement may be deemed to be unenforceable, such unenforceability shall not affect any other provision hereof. This Agreement shall be binding upon the successors and permitted assigns of the parties hereto, but neither of the parties hereto shall assign this Agreement without prior written consent of the other party. No amendment, modification or waiver of any provision of this Agreement will be effective unless and until it is reduced to writing and signed by all parties.

13. <u>Term.</u> This Agreement and all rights and obligations of the parties hereunder shall terminate on the earlier of (i) the date of entry into of a definitive agreement regarding the Transaction with the Recipient, or (ii) two (2) years from the date set forth below provided, however, with respect to Confidential Information that constitutes a trade secret under the Uniform Trade Secrets Act, the obligations under Section 3 hereof shall continue so long as such Confidential Information remains a trade secret under the Uniform Trade Secrets Act.

14. <u>Common Interest; Privileges.</u> The parties to this Agreement share a common legal and commercial interest in the Confidential Information that is and remains subject to all applicable privileges, including attorney-client privilege, anticipation of litigation privilege, work product privilege and privilege in respect of "without prejudice" communications. No waiver of any privilege is implied or intended by the disclosure of Confidential Information to any person pursuant to the terms of this Agreement.

15. <u>Miscellaneous.</u> This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail in .pdf or similar format shall constitute effective execution and delivery of this Agreement as to the parties. For purposes of this Agreement any reference to "written" or "in writing" shall be deemed to include correspondence by signed letter or facsimile or by e-mail.

IN WITNESS WHEREOF, the parties have caused this Confidentiality Agreement to be executed on May 7th                    , 2024.


Client:     **Project Rotary - Client #361**
By:          **Crown Point Partners, LLC, as Exclusive Representative**

Rodger Adams, Managing Partner


Accepted and agreed to as of the date above:

<u>RECIPIENT</u>

Company Name: Wm. W. Meyer & Sons

Signature:

Name:          Charles Meyer

Title:          CEO

Complete Address:          1700 Franklin Blvd

Telephone:          (847) 918-8169

Email Address:          cmeyer@wmwmeyer.com

**COMPANY**

Company Name: Precision Machine & Manufacturing, Inc.

Signature: *J. C. Blan*

Name: Jose Blanco

Title: Manager, Authorized Signatory